AO 91 (Rev. 11/11)  Criminal Complaint

**FILED**

Oct 26 2023

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

# UNITED STATES DISTRICT COURT
### for the
### Northern District of California

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Yessenia Margarita BARRIENTOS-Lainez | ) | Case No.  3:23-mj-71603 MAG |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___November 30, 2022 - May 11, 2023___ in the county of ___San Francisco___ in the

___Northern___ District of ___California___ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1956(h) | Conspiracy to launder monetary instruments |
| 18 U.S.C. § 982 | Maximum penalties:<br>• Imprisonment: 20 years (18 U.S.C. § 1956(a)(2))<br>• Fine: $500,000 (18 U.S.C. § 1956(a)(2))<br>• Supervised Release: 3 years (18 U.S.C. § 3583(b)(2))<br>• Special Assessment: $100 (18 U.S.C. § 3013(a)(2)(A))<br>• Forfeiture (18 U.S.C. § 982) | Deportation |

This criminal complaint is based on these facts:

Please see the attached affidavit of DEA SA Connor R. Hooper

☑ Continued on the attached sheet.

Approved as to form */s/ Nicholas M. Parker*
AUSA Nicholas M. Parker

/s/ Connor R. Hooper
*Complainant's signature*

DEA SA Connor R. Hooper
*Printed name and title*

Sworn to before me by telephone.

Date: ___10/25/2023___

*Judge's signature*

City and state: ___San Francisco, California___      Hon. Lisa J. Cisneros, U.S. Magistrate Judge
*Printed name and title*

| Print | Save As... | Attach | Reset |
|---|---|---|---|

<u>**AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT**</u>

I, Connor R. Hooper, a Special Agent of the Drug Enforcement Administration (DEA), being duly sworn, hereby declare as follows:

## INTRODUCTION AND PURPOSE OF AFFIDAVIT

1.      I make this Affidavit in support of an application under Rule 4 of the Federal Rules of Criminal Procedure for an arrest warrant, summons, and criminal complaint charging **Yessenia Margarita BARRIENTOS-Lainez** with one count of conspiring to launder monetary instruments, in violation of 18 U.S.C. §§ 1956(h) and 1956(a)(2)(B), beginning on a date unknown, but no later than November 30, 2022, and lasting until a date unknown, but no earlier than May 11, 2023, in the Northern District of California.

## SOURCES OF INFORMATION

2.      Because this Affidavit is submitted for the limited purpose of securing a criminal complaint, arrest warrant, and summons, I have not included every fact known to me concerning this investigation. Instead, I have set forth only the facts necessary to establish probable cause that the violations of federal law identified above have occurred.

3.      I have based my statements in this Affidavit on my training and experience, personal knowledge of the facts and circumstances obtained through my participation in this investigation, information provided by other agents and law enforcement officers, and information provided by records and databases. I believe these sources to be reliable. Where I refer to conversations and events, I refer to them in substance and in relevant part rather than in their entirety or verbatim, unless otherwise noted. This Affidavit also reflects my current understanding of facts relating to this investigation, but my understanding may change in the future as the investigation proceeds.

## AFFIANT BACKGROUND

4.      I am a Special Agent with the DEA assigned to the DEA San Francisco Divisional Oakland Resident Office in Oakland, California, and have been so employed since July 2019.

5.      As a Special Agent of the DEA, I am an investigator and law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7). I am empowered by law to conduct investigations, to execute search warrants, and to make arrests for offenses of federal law, including drug and money laundering offenses. I investigate narcotics and related offenses.

6.      My training included a seventeen-week DEA Basic Agent Training Academy at the DEA Academy in Quantico, Virginia. This training included instruction in the investigation of federal drug violations, including, but not limited to, 21 U.S.C. §§ 841 and 846. Additionally, this training included several hundred hours of comprehensive, formalized instruction in, but not limited to, narcotics investigations, drug identification, detection, interdiction, financial investigations and money laundering, informant handling, law classes, report writing, identification and seizure of drug related assets, undercover operations, and electronic and physical surveillance procedures.

7.      During the course of my employment as a DEA Special Agent, I have participated in over 30 narcotics investigations either as a case agent or in a supporting role. I have debriefed defendants, confidential sources, and witnesses who had personal knowledge regarding narcotics trafficking organizations. I also have participated in many aspects of drug investigations including, but not limited to, undercover operations, telephone toll analysis, records research, and physical and electronic surveillance. I have assisted in court-ordered wiretap investigations, and I have participated in the execution of numerous federal and state narcotics search and arrest warrants that resulted in the arrest of suspects and seizure of narcotics.

8.      Through my training, education, experience, and my conversations with other experienced agents and officers who conduct drug investigations, I have become familiar with narcotics traffickers' use of mobile telephones and mobile telephone applications, Internet applications, social media applications, as well as narcotics traffickers' use of code words to conduct business. I have become familiar with narcotics traffickers' methods of operation, including, but not limited to, the manufacturing, distribution, storage, and transportation of narcotics, and the methods used by drug traffickers to collect, transport, safeguard, remit, and/or

launder drug proceeds, including through their use of money-services businesses to wire money from the United States to foreign countries, including Mexico.

9.     During the course of my law enforcement career, I have been involved in investigations of numerous federal and state criminal offenses. I have participated in numerous investigations of illicit drug trafficking organizations, ranging from street level dealers to major drug trafficking organizations (DTO). These investigations have included the use of confidential sources (CS), undercover agents (UC), and sources of information (SOI) (collectively "Sources"). These investigations have also included the unlawful importation of, possession with intent to distribute, and distribution of controlled substances, the related laundering of monetary instruments, the conducting of monetary transactions involving the proceeds of specified unlawful activities, and conspiracies associated with criminal narcotics offenses, etc. These investigations have resulted in numerous state and/or federal prosecutions of individuals who have possessed, imported, or distributed controlled substances, as well as the seizure of those illegal drugs and the proceeds from the sale of those illegal drugs.

10.     I have been involved in the execution of numerous federal and/or state narcotics-related search warrants. As a result, I have encountered and become familiar with the various tools, methods, trends, paraphernalia, and related articles used by drug traffickers and trafficking organizations in their efforts to import, conceal, manufacture, and distribute controlled substances. I am familiar with the appearance of heroin, cocaine, methamphetamine, marijuana, MDMA, and other controlled substances. I am familiar with and aware of the terminology used by narcotics traffickers concerning narcotics and narcotics dealing.

11.     I have interviewed numerous drug dealers, users, and confidential informants, and have discussed with them the lifestyle, appearances, and habits of drug dealers and users, the use and meaning of coded language and the concealment of assets. I have become familiar with the manner in which narcotics traffickers smuggle, transport, store, and distribute narcotics, as well as how they collect and launder drug proceeds. I am also familiar with the manner in which narcotics traffickers use telephones, cellular telephone technology, pagers, coded or slang-filled

telephone conversations, false or fictitious identities, and other means to facilitate their illegal activities and thwart law enforcement investigations.

12.     During my time at DEA, I have initiated and participated in Organized Crime Drug Enforcement Task Force (OCDETF) investigations. The OCDETF program is part of the United States Attorney General's drug strategy to reduce the availability of drugs by disrupting major trafficking organizations through joint-agency collaboration.

13.     I have participated in approximately five investigations in which court-authorized Title III interceptions were used in narcotics and/or money laundering investigations. During these investigations, I have listened to and deciphered conversations between narcotics traffickers in which they discussed their criminal activities in coded language or intentionally vague language, and which were later corroborated by surveillance or defendants' statements. I have also interviewed several drug traffickers after their arrest, as well as confidential sources, and discussed with them the meaning of the coded language they used during the course of the commission of drug and money laundering offenses. During these interviews, the arrested drug traffickers and confidential sources have explained to me how they use coded language to conceal the true nature of their conversations from law enforcement and anyone who may be listening or overhear the conversation. As a result, a person who did not know the code or their meaning would think the individuals were having an innocent conversation or would be confused by the conversation since it would not make sense to that person.

14.     Before joining DEA, I was police officer for the City of Chicago. As part of my official duties as a Chicago Police Officer, I responded to 911-dispatched calls involving homicides, gang and domestic violence, drug trafficking, emergencies, traffic accidents, and other criminal activity. I arrested numerous individuals, to include drug traffickers, on misdemeanors and felony charges. In addition, I collected preliminary investigation information as a first responder to crime scenes. I conducted over 100 traffic stops, while also issuing citations and mandatory court appearances. I organized and wrote reports related to arrests, investigatory stops, and other observed incidents. In this role, I also participated in the execution

of multiple state issued search warrants, and testified in the State of Illinois Circuit Court of Cook County. I collected and processed evidence to include firearms and narcotics. I interviewed violent offenders and drug traffickers, as well as obtained testimony from witnesses and/or victims.

15.     I have personally participated in the investigation discussed in this affidavit. I am familiar with the facts and circumstances of the investigation through my personal participation. I have also learned other things about this investigation from fellow law enforcement officers and agents. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by a DEA agent or task force officer, law enforcement officer, or witness who may have had either direct or hearsay knowledge of that statement and to whom I or others have spoken, or whose reports I have read and reviewed. Such statements are among many made by others and are stated in substance and in part unless otherwise indicated. Because this affidavit is being submitted for the limited purpose of showing that there is sufficient probable cause for the requested warrant, I have not set forth everything I know about this investigation.

## APPLICABLE LAW

16.     Sections 1956 and 1957 of Title 18 of the United States Code make it a crime to launder money connected to criminal activity. Specifically, as relevant here:

17.     Section 1956(a)(2)(B) makes it a crime to transport, transmit, or transfer—or attempt to transport, transmit, or transfer—a monetary instrument or funds from inside the United States to or through a foreign country or vice versa knowing that the monetary instrument or funds represent the proceeds of some form of unlawful activity and knowing that the transportation, transmission, or transfer of the monetary instrument or funds is designed in whole or in part (i) to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity; or (ii) to avoid a transaction reporting requirement under state or federal law. The elements of this offense are:

> a.     The defendant transported or intended to transport money (1) from a place in the United States to or through a place outside the United States, or (2) to a place in the United States from or through a place outside the United States;

b.    The defendant knew the money represented the proceeds of some form of unlawful activity; and

c.    The defendant knew the transportation was designed in whole or in part (1) to conceal or disguise the nature, location, source, ownership, or control of the proceeds; or (2) to avoid a transaction reporting requirement under state or federal law.

18.    Section 1956(h) makes it a crime to conspire to commit any offense defined in Sections 1956 or 1957. The elements of this offense are:

a.    There was an agreement to commit money laundering;

b.    The defendant knew the objective of the agreement; and

c.    The defendant joined the agreement with the intent to further its unlawful purpose.

19.    For purposes of Sections 1956 and 1957, specified unlawful activity includes, among other things, felony offenses under Subchapter 1 of Title 21 of the United States Code, which includes 21 U.S.C. § 841(a)(1), which prohibits the knowing and intentional distribution of, or possession with intent to distribute, controlled substances, and 21 U.S.C. § 846, which prohibits conspiring to commit a violation of, among other things, Section 841(a)(1).

**FACTS ESTABLISHING PROBABLE CAUSE**

**A.    Arrest and Identification of CO-CONSPIRATOR 1**

20.    On June 1, 2023, in Daly City, California, DEA agents and other law enforcement officers arrested, and seized multiple cell phones from, two men who had been under investigation for drug trafficking in the Tenderloin district of San Francisco, perhaps among other places.

21.    One of the men, CO-CONSPIRATOR 1, had approximately 135 grams (net) of crack cocaine—an amount that is, in my training and experience, more consistent with distribution than with personal use—in his possession at the time. He had also been in regular contact, and communicated about drugs and drug trafficking, with the other individual with whom he was arrested, as evidenced by (i) toll records from the time period April 14, 2023, to May 5, 2023; and (ii) intercepted wire and electronic communications from the time period May

12, 2023, to June 1, 2023—which communications were intercepted pursuant to an order signed by the Hon. Edward J. Davila on May 11, 2023. Based on my training, experience, and knowledge of this investigation, including my review of the content of intercepted communications between the two men, I believe CO-CONSPIRATOR 1 was a supplier of narcotics to the other man with whom he was arrested on June 1, 2023. That other man was himself a known street-level drug dealer from whom I purchased drugs as an undercover officer in the Tenderloin five times between January 13, 2023, and May 18, 2023.

22.     At the time of his arrest, CO-CONSPIRATOR 1 did not have identification in his possession, but he told arresting officers that his "wife" could send them a photo of his ID. CO-CONSPIRATOR 1 provided officers with his "wife's" phone number—a number subscribed to **BARRIENTOS** at an address in Daly City. Officers called **BARRIENTOS**, who said she would (and in fact did) send them a photograph of CO-CONSPIRATOR 1's identification: a Mexican voter ID card bearing CO-CONSPIRATOR 1's true name and a photograph resembling the man who was in the officers' custody at the time.

23.     Both CO-CONSPIRATOR 1 and the other man arrested with him on June 1, 2023, were subsequently charged with federal drug offenses, and DEA agents later obtained a federal search warrant for the cell phones seized from the two men at the time of their arrest. Some of the material found on CO-CONSPIRATOR 1's phones is discussed elsewhere in this Affidavit.

**B.      Background on BARRIENTOS and Her Role as a Money Launderer**

24.     As part of their investigation into CO-CONSPIRATOR 1 and other suspected drug traffickers in the Tenderloin, DEA agents learned that, until sometime in mid-May 2023, **BARRIENTOS** worked as a teller at MSB 1, a money services business (MSB) located in San Francisco, California.

25.     Upon reviewing the contents of two cell phones seized from CO-CONSPIRATOR 1 at the time of his arrest, agents found evidence of communications between **BARRIENTOS** and CO-CONSPIRATOR 1 regarding the suspected transfer and laundering of drug proceeds. Specifically, agents found evidence suggesting that **BARRIENTOS** used her position at the

MSB where she formerly worked to launder drug proceeds for CO-CONSPIRATOR 1 (and possibly others) by sending significant sums of cash to various foreign bank accounts, including many located in Mexico. As discussed in more detail herein, such evidence consisted of, among other things, communications between **BARRIENTOS** and CO-CONSPIRATOR 1, as well as photographs found on CO-CONSPIRATOR 1's phone and surveillance footage from MSB 1. Agents also found evidence that **BARRIENTOS** and CO-CONSPIRATOR 1 were in a romantic relationship (*e.g.*, repeated text messages saying "Te amo," or "I love you") corroborating CO-CONSPIRATOR 1's statement to officers at his arrest that **BARRIENTOS** was his "wife." (Agents do not believe **BARRIENTOS** and CO-CONSPIRATOR 1 are, or have ever been, legally married.)

### C.    BARRIENTOS' Communications with CO-CONSPIRATOR 1 on May 1, 2023

26.    On May 1, 2023, when she was still employed at MSB 1, **BARRIENTOS** sent CO-CONSPIRATOR 1 the following messages[1]:

| | |
|---|---|
| **BARRIENTOS**: | "My boss left" (1:22 p.m.) |
| **BARRIENTOS**: | "For the shipments" (1:22 p.m.) |
| **BARRIENTOS**: | "If you want, send me the information and you can just come to drop off the money" (1:22 p.m.) |

27.    Based on my training, experience, conversations with other experienced law enforcement officers, and knowledge of this investigation, I believe **BARRIENTOS** was telling CO-CONSPIRATOR 1 that her supervisor had left for the day, which freed her up to send wires ("shipments"), and that CO-CONSPIRATOR 1 need only provide her with names and account numbers for the recipients of the wires and then bring cash to her so she could execute those wires.

28.    Approximately 30 minutes later, at 1:51 p.m., CO-CONSPIRATOR 1 sent **BARRIENTOS** a photograph depicting a series of handwritten names with corresponding 16-digit numbers consistent with numbers assigned to bank accounts (Figure 1). None of the names

---

[1] **BARRIENTOS** and CO-CONSPIRATOR 1 communicated in Spanish; the English-language translations that appear herein are preliminary and were prepared by a native Spanish speaker employed by the DEA.

on the list were CO-CONSPIRATOR 1. Approximately five minutes later, **BARRIENTOS** told

CO-CONSPIRATOR 1 "I'll see you here" and "I will do it for you."

Figure 1: names and numbers sent by CO-CONSPIRATOR 1 to **BARRIENTOS** (May 1, 2023)



29.     Based on my training, experience, and knowledge of narcotics investigations

involving Tenderloin drug traffickers such as CO-CONSPIRATOR 1, I believe the names and

suspected account numbers listed in Figure 1, above, were the intended recipients of CO-

CONSPIRATOR 1's drug proceeds. I know it is common for drug traffickers to send the

proceeds of their sales to foreign countries (including Mexico) via wire transfer. Among other

reasons, sending money by wire requires little paperwork and minimizes the risk of being

arrested with large quantities of cash, thus thwarting law enforcement investigations.

30.     At 2:27 p.m.—that is, about 35 minutes after CO-CONSPIRATOR 1 sent her the

names and suspected account numbers listed in Figure 1, above—**BARRIENTOS** sent CO-

CONSPIRATOR 1 a photograph of a receipt reflecting a wire transfer of $2,900 to J.M.V. in Sinaloa, Mexico (account number ending in *7945) (Figure 2).[2] Those details match the third name and account number reflected on the list in Figure 1, above. The receipt below suggests, and records received from MSB 1 confirm, that this transaction (i) occurred at 2:23 p.m. on May 1, 2023; (ii) was processed by a teller with the operator ID "YBA"; and (iii) was sent in the name of CO-CONSPIRATOR 1.

Figure 2: wire transfer receipt sent by **BARRIENTOS** to CO-CONSPIRATOR 1 (May 1, 2023)



---

[2] I know that drugs of all sorts, including methamphetamine and fentanyl, are manufactured in and distributed out of Sinaloa, Mexico, and that many Mexican drug suppliers are located in Sinaloa; after all, the Sinaloa Cartel is considered to be among Mexico's most dominant drug cartels, even after the arrest of its leader, Joaquin "El Chapo" Guzman.

31.     At 2:39 p.m., about 12 minutes later, **BARRIENTOS** sent CO-CONSPIRATOR 1 another photograph of a receipt reflecting a wire transfer of $2,100 to L.A.F.V. in Yucatan, Mexico (account number ending in *3773) (Figure 3). Those details match the <u>first</u> name and account number reflected on the list in Figure 1, above. The receipt below suggests, and records received from MSB 1 confirm, that this transaction (i) occurred at 2:35 p.m. on May 1, 2023; (ii) was processed by a teller using the operator name "YESSENIA51"; and (iii) was sent in the name of **BARRIENTOS**' husband (who is *not* CO-CONSPIRATOR 1).

Figure 3: wire transfer receipt sent by **BARRIENTOS** to CO-CONSPIRATOR 1 (May 1, 2023)



32.     At 3:10 p.m., about 30 minutes later, **BARRIENTOS** sent CO-CONSPIRATOR 1 another photograph of a receipt reflecting a wire transfer of $2,000 to L.A.L.S.F. in Sinaloa, Mexico (account number ending in *0643) (Figure 4). Those details match the second name and account number reflected on the list in Figure 1, above. The receipt below suggests, and records received from MSB 1 confirm, that this transaction (i) occurred at 3:09 p.m. on May 1, 2023; (ii) was processed by a teller using the operator name "YESSENIA51"; and (iii) was sent in the name of an unknown individual with the initials R.M.V.

Figure 4: wire transfer receipt sent by **BARRIENTOS** to CO-CONSPIRATOR 1 (May 1, 2023)



33.     In light of the totality of the circumstances—and based on my training, experience, and knowledge of this investigation—I submit that CO-CONSPIRATOR 1 handed

BARRIENTOS approximately $7,000 in cash between 1:22 p.m. and 2:27 p.m. on May 1, 2023,
and that BARRIENTOS sent CO-CONSPIRATOR 1 photographs of the receipts included herein
as Figures 2, 3, and 4 as proof of payment, and that her doing so is evidence of her using her
employment at MSB 1 to launder CO-CONSPIRATOR 1's drug proceeds on his behalf.

34.     Around the time BARRIENTOS sent him the third receipt (Figure 4, above),
CO-CONSPIRATOR 1 sent her a series of messages asking how much he owed her for processing
the wires ("How much is it" and "For the payment"). The following conversation ensued:

| | |
|---|---|
| BARRIENTOS: | "On the 7000, there was 10 dollars more" (3:11 p.m.) |
| BARRIENTOS: | "It's 60 for the wires" (3:12 p.m.). |
| CO-CONSPIRATOR 1: | "How much would I end up owing" (3:13 p.m.)[3] |
| CO-CONSPIRATOR 1: | "Ok, love" (3:13 p.m.) |
| CO-CONSPIRATOR 1: | "Thank you, I'll stop by to give them to you" (3:13 p.m.) |
| BARRIENTOS: | "Just 60, love" (3:13 p.m.) |
| CO-CONSPIRATOR 1: | "I'll stop by, love" (3:14 p.m.) |
| CO-CONSPIRATOR 1: | "Thank you very much" (3:14 p.m.) |
| CO-CONSPIRATOR 1: | "Very kind of you" (3:14 p.m.) |
| CO-CONSPIRATOR 1: | "Thank you, love" (3:23 p.m.) |
| BARRIENTOS: | "Love, you gave me extra cash" (3:29 p.m.) |
| BARRIENTOS: | "It was only 60" (3:29 p.m.) |
| BARRIENTOS: | "You gave me 360" (3:30 p.m.) |
| CO-CONSPIRATOR 1: | "For you, love" (4:11 p.m.) |
| CO-CONSPIRATOR 1: | "They are for you because of the favor, love" (4:11-4:13 p.m.) |
| BARRIENTOS: | "You don't have to pay me that much" (4:18 p.m.) |
| CO-CONSPIRATOR 1: | "I'm not paying you" (4:18 p.m.) |
| CO-CONSPIRATOR 1: | "I'm just grateful because of the favor, love" (4:19 p.m.) |

---

[3] This message and certain other messages in this conversation have been consolidated from
multiple messages for clarity and brevity.

| | |
|---|---|
| **BARRIENTOS**: | "Thank you, but that's a lot" (4:24 p.m.) |
| CO-CONSPIRATOR 1: | "No, love" (4:24 p.m.) |
| CO-CONSPIRATOR 1: | "Don't take it as a payment, but as gratitude, love" (4:24 p.m.) |
| CO-CONSPIRATOR 1: | "Thanks for the favor and being so kind with me" (4:25 p.m.) |

35.     Based my training, experience, knowledge of this investigation specifically and Tenderloin drug traffickers' practices generally—including the fact that I know drug dealers operating in the Tenderloin (as CO-CONSPIRATOR 1 did until his arrest in June 2023) commonly use MSBs to send proceeds from drug sales to their suppliers, who are often in Mexico—and on the totality of the circumstances as described herein, I believe CO-CONSPIRATOR 1 and **BARRIENTOS** were working together on May 1, 2023, to coordinate the transfer of $7,000 in drug proceeds to three specific individuals in Mexico whose names and bank account numbers CO-CONSPIRATOR 1 provided to **BARRIENTOS**. When CO-CONSPIRATOR 1 asked **BARRIENTOS** how much he owed her for sending the three wires depicted in Figures 2, 3, and 4, above, I believe he was asking **BARRIENTOS** what she charges as an under-the-table fee for processing illegitimate wire transfers. I also believe **BARRIENTOS** told CO-CONSPIRATOR 1 that (i) he had handed her $10 extra ($7,010 instead of $7,000) to send to the three recipients described herein; and (ii) her fee for processing the wires was $60, *i.e.*, $20 per wire. Finally, I believe—based on the timestamps of the messages transcribed above—that although **BARRIENTOS** told CO-CONSPIRATOR 1 at 3:13 p.m. that her fee was $60, CO-CONSPIRATOR 1 handed her $360 sometime between 3:14 p.m. and 3:29 p.m.

36.     Based on my training and experience, and on my conversations with other law enforcement officers who regularly investigate financial crimes and money laundering offenses, I know that MSBs like MSB 1 require a second form of identification for wires exceeding $3,000. Accordingly, I know that people engaged in money laundering often structure their transactions to fall under $3,000. Of note here, although CO-CONSPIRATOR 1 never texted **BARRIENTOS** to tell her how much money to send to any of the three recipients listed in Figure 1, above, **BARRIENTOS** sent them $2,900, $2,100, and $2,000, respectively, suggesting

she knew to send less than $3,000 to each person—and that in doing so she was evading certain reporting requirements.

**D.     Other Evidence Linking BARRIENTOS to the Money Laundering Scheme**

37.     The wires and communications between **BARRIENTOS** and CO-CONSPIRATOR 1 on May 1, 2023, are not the only evidence of **BARRIENTOS'** criminal activity on CO-CONSPIRATOR 1's phones.

38.     For example, a photograph on CO-CONSPIRATOR 1's phone of a receipt from MSB 1 suggests **BARRIENTOS** sent a wire transfer of $1,500 to a man named J.M.F.M. in Puebla, Mexico on May 11, 2023 (Figure 5).

Figure 5: wire transfer receipt found on CO-CONSPIRATOR 1's phone (May 11, 2023)



39.     In addition, on November 30, 2022, **BARRIENTOS** and CO-CONSPIRATOR 1 had a conversation on WhatsApp in which **BARRIENTOS** said she could not process wires for CO-CONSPIRATOR 1 because her system was "down" and MSB 1 was about to close. When CO-CONSPIRATOR 1 asked her to "enter" the wires "as soon as you can please," **BARRIENTOS** said she would do it the following day, prompting CO-CONSPIRATOR 1 to say "they need them down there please." Based on the context of the conversation, I believe "they" was a reference to CO-CONSPIRATOR 1's drug suppliers and "down there" was a reference to Mexico. (In the graphic on the right, below, the left column reflects the original Spanish; the right column is an English translation.)





40.     In addition, on June 27, 2023, agents interviewed L.R., a compliance officer at MSB 1. L.R. told agents that **BARRIENTOS** worked at MSB 1 for nine years and had been a trusted employee until approximately April 2023, when she was caught on camera conducting suspicious wire transfers. According to L.R., MSBs like MSB 1 require the sender of a wire to be present at the MSB for the transaction—and to present photo identification if the wire is above a certain amount, often $1,000. Notwithstanding that requirement, L.R. said video footage from inside MSB 1 showed **BARRIENTOS** conducting legitimate wire transactions interspersed with illegitimate ones for which no customer was present at her teller station. With respect to the illegitimate transfers, L.R. said the footage showed **BARRIENTOS** using an assortment of identification cards already in her possession to process wire transfers to various locations in Mexico, including Sinaloa, Los Mochis, and Mazatlán, with no customers visible at her teller station.

41.     L.R. also said **BARRIENTOS** sometimes left MSB 1 on the pretense of getting coffee and returned not with coffee but with bags of cash, which she had retrieved from a car on the street outside the MSB. She then pulled cash from the bag, wired it to various locations in Mexico, and pocketed $100 per transaction for herself. L.R. knew of CO-CONSPIRATOR 1, who she identified as **BARRIENTOS**' boyfriend, and said he had been inside MSB 1. Further, L.R. said that after **BARRIENTOS** was fired, several people came into MSB 1 and asked for her specifically. Finally, L.R. confirmed that **BARRIENTOS**' phone number was the same one used to send the photographs of the wire receipts depicted herein as Figures 2, 3, and 4 to CO-CONSPIRATOR 1.

42.     After speaking with L.R., agents reviewed video footage provided by MSB 1 showing **BARRIENTOS** conducting suspicious wire transactions. Among other things, that footage shows **BARRIENTOS** leaving the MSB on April 25, 2023, to meet an unknown individual in a white car. The footage shows the unknown individual handing **BARRIENTOS** a white plastic bag that appears to contain one or more bulky items (Figure 6).

Figure 6: **BARRIENTOS** retrieving white plastic bag from unknown individual



The footage then shows **BARRIENTOS** return to MSB 1 with the white plastic bag, which she places under her workstation. The footage shows **BARRIENTOS** opening the bag and pulling out large amounts of cash, which she runs through a money counting machine. A short time later, **BARRIENTOS** begins processing wire transfers totaling what appear to be thousands of dollars. The video shows that there are no customers at **BARRIENTOS**' window while she is processing the wire transfers, after which the video shows her using a cell phone to taking photographs of the money and receipts, which she appears to send via text message (Figure 7).

Figure 7: **BARRIENTOS** processing large sums of cash with no customers visible



43.     Based on my training, experience, knowledge of this investigation, review of the video footage, and interview with L.R., I believe **BARRIENTOS** was using her employment at MSB 1 to aid individuals in sending large sums of money abroad, often to Mexico, without being traced. I further believe **BARRIENTOS** knew she was engaging in unlawful activity given that she interspersed illegitimate wire transfers—transfers for which she used identification cards already in her possession to send large sums of money to Mexico without actual customers present—with legitimate wire transfers sent on behalf of actual customers. I further believe **BARRIENTOS** often wired money in amounts that were designed to fall below various reporting thresholds.

44.     **BARRIENTOS** used the operator names "YESSENIA51" and "YESSENI" while working at MSB 1. From 2019 to 2023, **BARRIENTOS** used those operator names to send at least $22,000 mostly to Mexico for CO-CONSPIRATOR 1.[4] Agents' investigation has determined that CO-CONSPIRATOR 1 had no legitimate employment or income in the United States. They therefore believe the money he and **BARRIENTOS** worked together to send to Mexico was largely, if not exclusively, proceeds from drug trafficking, in violation of 21 U.S.C. §§ 841(a)(1) and 846.

45.     For the foregoing reasons, and based on the totality of the circumstances, my training, experience, and knowledge of this investigation, I believe **BARRIENTOS** knew of CO-CONSPIRATOR 1's drug trafficking activities and was a witting and willing participant in his scheme to send proceeds from those drug trafficking activities to Mexico, in violation of 18 U.S.C. §§ 1956(h) and 1956(a)(2)(B), beginning on a date unknown, but no later than November 30, 2022, and lasting until a date unknown, but no earlier than May 11, 2023, in the Northern District of California.

---

[4] This includes only those transactions for which CO-CONSPIRATOR 1 is listed as the sender of the funds. However, as discussed elsewhere in this affidavit, **BARRIENTOS** often wired money abroad using other identification cards in her possession. Indeed, she sent a receipt to CO-CONSPIRATOR 1 showing *herself* as the sender of $1,500 to Mexico (*see* Figure 5). Thus, the true amount **BARRIENTOS** wired to Mexico for CO-CONSPIRATOR 1 is likely far greater.

## SEALING REQUEST

46.     Based on my training and experience, the disclosure of the existence of this Affidavit, the criminal complaint, arrest warrant, summons, and/or all related documents may cause **BARRIENTOS**' coconspirators, known and as-yet unknown, to destroy evidence or to conceal ongoing criminal activity, jeopardizing the progress of this ongoing investigation. The disclosure of these documents may also cause co-conspirators to flee from prosecution. I therefore request that the Court seal this Affidavit, the criminal complaint, arrest warrant, summons, and all related documents.

## CONCLUSION

47.     Based on the facts set forth in this Affidavit, I submit there is probable cause to believe **BARRIENTOS** conspired with CO-CONSPIRATOR 1, perhaps among others, to launder monetary instruments, in violation of 18 U.S.C. §§ 1956(h) and 1956(a)(2)(B), beginning on a date unknown, but no later than November 30, 2022, and lasting until a date unknown, but no earlier than May 11, 2023, in the Northern District of California.

48.     Accordingly, I respectfully request that the Court issue this criminal complaint, as well as a warrant for **BARRIENTOS**' arrest and a summons for her to appear in court on the charges set forth herein.


 /s/ *Connor Hooper*
CONNOR R. HOOPER
Special Agent
Drug Enforcement Administration


Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1 and 4(d) on this 25th day of October 2023.


HON. LISA J. CISNEROS
United States Magistrate Judge